**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | | |
|---|---|---|
| **United States of America,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Criminal Action Number** |
| | ) | **10-00094-02-CR-W-FJG** |
| **Gilberto Baldenegro-Valdez,** | ) | |
| | ) | |
| **Defendant.** | ) | |

# REPORT AND RECOMMENDATION

Pending before the Court is the MOTION TO SUPPRESS EVIDENCE AND STATEMENTS (Doc. #29) filed on July 18, 2010, by defendant Gilberto Baldenegro-Valdez ("Baldenegro-Valdez"). On August 25, 2010, the undersigned held an evidentiary hearing on Baldenegro-Valdez' motion. Baldenegro-Valdez was present and represented by his counsel, John G. Gromowsky. The government was represented by Assistant United States Attorney Paul S. Becker. At the evidentiary hearing, the government called six law enforcement witnesses, to wit: Mark Corbin, Keegan Hughes, Kevin Nightengale, Shaun Warren, Wendi Winans, and Luis Alvarez. Additionally, the following exhibits were admitted into evidence without objection:

| Number | Description |
|---|---|
| Govt. #1 | Signed *Miranda* waiver |
| Govt. ##2, 3 | Tow/search policies of the Independence Police Department |
| Govt. #4 | Video reproduction of traffic stop |
| Deft. ##1 | Traffic citation |
| Deft. # 2 | Police report |

On the basis of all the evidence adduced at the evidentiary hearing, the undersigned submits the following:

**PROPOSED FINDINGS OF FACT**

1. In March of 2010, Detective Mark Corbin of the Lee's Summit Police Department was assigned to the FBI as a task force officer with the Criminal Enterprise Squad. Tr. at 4-5.

2. On March 19, 2010, Det. Corbin and other officers interviewed a cooperating witness whose identity remains confidential ("the CI") in a methamphetamine investigation. Tr. at 5.

3. The CI told officers that he could arrange the purchase of methamphetamine. Tr. at 5-6.

4. The lead case agent on the investigation of the CI's information was Detective Paul Brooks from the Jackson County, Missouri Drug Task Force. Tr. at 5, 26, 27.

5. On March 20, 2010, at the behest of officers, the CI contacted by telephone an individual identified as "Felipe" and arranged to purchase an ounce of methamphetamine for $1,500.00 the next day. Tr. at 5-6.

6. The CI told "Felipe" that the initial purchase was for the purpose of testing the methamphetamine for his buyer and if the product was acceptable, the CI's buyer would purchase a larger amount. Tr. at 6.

7. The next day, on March 21, 2010, as per the plan arranged between the CI and "Felipe," a meeting occurred in the parking lot of a grocery store in Kansas City, Missouri. Tr. at 6.[1]

8. At that meeting, a red Ford Taurus met the CI in the parking lot. Tr. at 7, 31-32, 41.

9. There were two Hispanic men in the Taurus – the driver who was later identified as Baldenegro-Valdez and the passenger who was later identified as the co-defendant in this action, Felipe Camarena ("Camarena") and as the "Felipe" that spoke on the telephone to the CI. Tr. at 7, 10, 32, 34.

---

[1] All of the telephone conversations between the CI and "Felipe" were recorded and all of the arranged "drug buy" meetings arranged by the CI were the subject of surveillance by law enforcement officers, including Det. Corbin and Detective Keegan Hughes and Officer Kevin Nightingale of the Jackson County Drug Task Force.

10. After the CI spoke briefly with the occupants in the Taurus, the two vehicles then traveled to the site of a car wash in Kansas City, Missouri. Tr. at 7-8, 32, 41.

11. At the car wash, the CI and the occupants of the Taurus interacted for approximately five minutes before the two vehicles left the car wash traveling in opposite directions. Tr. at 8, 19, 32-33.

12. Thereafter, the CI informed law enforcement officers that he had given $1,500.00 in prerecorded bills to Camarena and Baldenegro-Valdez at the car wash and, in exchange, had been given a coffee cup containing an all-white crystalline substance. Tr. at 8, 19-20.

13. The substance was field-tested (and showed a positive result for methamphetamine) and was weighed (and weighed approximately one ounce). Tr. at 8.

14. Subsequently, later in the day on March 21, 2010, the CI again contacted Camarena by telephone and told him that his buyer approved of the quality of the one ounce of methamphetamine and wished to purchase a pound of the product. Tr. at 9.

15. The CI and Camarena agreed on a purchase price of $27,500, and agreed to meet at a fast food restaurant in Kansas City, where the CI would then take Camarena to meet his buyer later in the afternoon of March 21, 2010. Tr. at 9-10.

16. At the fast food restaurant, the Taurus again arrived at the meeting place. Tr. at 10-11, 22.

17. Once again, the Taurus was being driven by Baldenegro-Valdez, with Camarena in the passenger seat. Tr. at 10-11, 22, 34.

18. Baldenegro-Valdez and Camarena parked the Taurus at the fast food restaurant and went into the establishment to meet the CI. Tr. at 11, 34.

19. After an approximately five to ten-minute conversation in the restaurant, the three individuals walked out of the restaurant with the CI getting in his vehicle and Baldenegro-Valdez and Camarena getting into the Taurus (with Baldenegro-Valdez again driving). Tr. at 11, 23, 34-35.

20. The two vehicles then pulled out of the parking lot. Tr. at 11, 35.

21. The CI then contacted law enforcement officers and told them that he was headed to a Quik Trip in Kansas City, Missouri. Tr. at 11-12.

22. After both vehicles arrived at the Quik Trip parking lot, the officers performing surveillance observed Camarena get out the Taurus and get into the CI's vehicle. Tr. at 12, 35.

23. The two vehicles then pulled out of the Quik Trip parking lot onto eastbound Independence Avenue in Kansas City, Missouri. Tr. at 12.

24. The CI then contacted his "buyers" (*i.e.*, law enforcement officers) and informed them that the one pound of methamphetamine was now in his vehicle. Tr. at 12, 28.

25. Upon receiving this information, the officers were instructed by Det. Brooks to stop both the CI's vehicle (in which Camarena was a passenger) and the Taurus (being driven by Baldenegro-Valdez) which was following the CI's vehicle. Tr. at 13, 36, 43, 53, 94.

26. Law enforcement officers involved in the surveillance and the controlled buys considered both Camarena and Baldenegro-Valdez as suspects for the possession and sale of methamphetamine and conspiracy to distribute a controlled substance. Tr. at 14-15, 24.

27. Officer Nightingale contacted Officer Shaun Warren of the Independence Police Department and asked if Officer Warren could assist in the stop of the two vehicles. Tr. at 44, 58-59.

28. Officer Nightingale informed Officer Warren that the occupants of the two vehicles had been involved in a narcotics deal. Tr. at 25, 48, 60-61, 69.

29. The Taurus being driven by Baldenegro-Valdez was stopped by Officer Warren. Tr. at 13, 61-62.

30. Officer Warren approached the Taurus and asked Baldenegro-Valdez for identification. Tr. at 62.

31. Baldenegro-Valdez provided Officer Warren with a Mexican driver's license and told Officer Warren that he did not have a United States driver's license. Tr. at 62.

32. Officer Warren then removed Baldenegro-Valdez from the Taurus, hancuffed him, put him in the back seat of a patrol car, and told Baldenegro-Valdez that "he was under arrest for not having a valid United States driver's license." Tr. at 14, 63, 84.

33. Officer Warren issued a ticket to Baldenegro-Valdez for not having a valid United States driver's license and also issued a ticket to Baldenegro-Valdez for operating a vehicle with a cracked windshield. Tr. at 72-73.

34. Officer Warren issued the tickets as "a backup" inasmuch as he assumed that the other officers would have their own drug charges to file against Baldenegro-Valdez. Tr. at 77-78.

35. While Baldenegro-Valdez was being secured and arrested by Officer Warren, other law enforcement officers who had arrived on the scene began searching the Taurus. Tr. at 64, 84.

36. The initial search of the Taurus by these officers did not disclose any contraband. Tr. at 64, 84-85.

37. Because of the underlying involvement of drugs, the custody of any evidence found and the ensuing seizure and inventory of the Taurus were the responsibility of the Jackson

County Drug Task Force – though the actual towing of the Taurus would have been arranged by the Independence Police Department since the arrest of Baldenegro-Valdez occurred in Independence. Tr. at 26, 65-66.

38. Pursuant to the written policy of the Independent Police Department, Officer Warren arranged for the Taurus to be towed. Tr. at 66; Gov't Exs 2, 3.

39. Prior to the Taurus being towed, Officer Warren and Detective Wendi Winans of the Jackson County Drug Task Force continued searching the Taurus. Tr. at 65.

40. Det. Winans had been part of the surveillance team for the first drug purchase earlier on March 21, 2010, and was part of the team following the surveillance with regard to the second controlled purchase of methamphetamine. Tr. at 82.

41. Det. Winans was looking for contraband. Tr. at 74.

42. Det. Winans noted that the glove box in the Taurus was loose, so she "tugged on it" and the glove box fell out revealing a compartment containing a plastic bag with a white crystal substance inside. Tr. at 65, 85-86.

43. The substance was later tested and weighed and was revealed to be 13 grams of methamphetamine. Tr. at 14.

44. The search being conducted by Officer Warren was for purposes of performing an inventory of personal property prior to towing. Tr. at 79, 89.

45. The only personal property recovered from the Taurus was contraband and thus no other items of personal property were inventoried. Tr. at 67.

46. Baldenegro-Valdez was subsequently transported to the Independence Police Department headquarters where he was advised of his *Miranda* rights, waived such rights, and made incriminating statements to law enforcement officers. Tr. at 15.[2]

---

[2] Camarena was also arrested at the site of the stop of the CI's vehicle and a search of that vehicle found 204 grams of methamphetamine. Tr. at 14.

**PROPOSED CONCLUSIONS OF LAW**

In his MOTION TO SUPPRESS EVIDENCE AND STATEMENTS, Baldenegro-Valdez asserts that law enforcement officers violated his constitutional rights in their actions on March 21, 2010. Specifically, Baldenegro-Valdez alleges:

(1) law enforcement officers did not have a valid basis for stopping the Taurus;

(2) law enforcement officers lacked probable cause to seize and arrest Baldenegro-Valdez without a warrant;

(3) law enforcement officers conducted an improper warrantless search of the Taurus, and

(4) the statements subsequently made by Baldenegro-Valdez are "fruit of the poisonous tree" and must be suppressed even if said statements were made voluntarily and after a knowing waiver of rights under *Miranda*.

The Court rejects each of the contentions raised by Baldenegro-Valdez.

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses,[3] papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." U.S. CONST. amend. IV. As made clear in the Fourth Amendment, the Constitution does not forbid all searches and seizures, but only <u>unreasonable</u> searches and seizures. *Elkins v. United States*, 364 U.S. 206, 222, 80 S.Ct. 1437, 1446 (1960). Nonetheless, as the United States Supreme Court pointedly noted over one hundred years ago:

> No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.

*Union Pacific Railroad Co. v. Botsford*, 141 U.S. 250, 251, 11 S.Ct. 1000, 1001 (1891).

---

[3] The stop of an individual in an automobile raises many of the same concerns – but as discussed *infra*, not all – as a search of an individual's home. *Delaware v. Prouse*, 440 U.S. 648, 662-63, 99 S.Ct. 1391, 1400-01 (1979).

In many search and seizure scenarios, the question of legal authority (as well as reasonableness) is presumptively satisfied by a judicially-issued warrant. However, over the years, many exceptions to the warrant requirement have been recognized. For instance, and pertinent to the initial issue in this case, in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868 (1968), the Supreme Court held that a law enforcement officer can stop and briefly detain a person for investigatory purposes, even without a warrant, if the officer has a reasonable suspicion – supported by articulable facts – that criminal activity "may be afoot," even if the officer lacks probable cause for an arrest. *Id*. at 30, 88 S.Ct. at 1884. However, the officer conducting such an investigatory stop must be able to articulate something more than an "inchoate and unparticularized suspicion or 'hunch.'" *Id*. at 27, 88 S.Ct. at 1883. Moreover, the mere fact that an officer's suspicion or hunch, in fact, was well-founded is <u>not</u> dispositive for a constitutional analysis, rather, the Fourth Amendment requires "some level of objective justification for making the stop." *INS v. Delgado*, 466 U.S. 210, 217, 104 S.Ct. 1758, 1763 (1984).

The rights protected by the Fourth Amendment are implicated in this case by Officer Warren's decision to stop the Taurus being driven by Baldenegro-Valdez. *Delaware v. Prouse*, *supra*, 440 U.S. at 653, 99 S.Ct. at 652-53. However, it well-settled that "[a]n investigation stop does not violate the Fourth Amendment if the police have a reasonable suspicion that the vehicle or its occupants are involved in criminal activity." *United States v. Bell*, 183 F.3d 746, 749 (8th Cir. 1999). In this case, the Court finds that Officer Warren had the requisite reasonable suspicion to stop the Taurus when he was provided information that the Taurus and the driver [Baldenegro-Valdez] had been involved in controlled drug buys earlier that day.

Not every proper *Terry* traffic stop, however, justifies the warrantless arrest of a driver. Instead, it is well-settled that probable cause to make a warrantless arrest only exists when "considering all the circumstances, police have trustworthy information that would lead a prudent person to believe that the suspect has committed or is committing a crime." *United States v. Parish,* 606 F.3d 480, 486 (8th Cir. 2010). In making this determination, "[l]aw enforcement officers have substantial latitude in interpreting and drawing inferences from factual circumstances." *United States v. Henderson,* 613 F.3d 1177, 1181 (8th Cir. 2010) (*internal quotation marks and citation omitted*). To that end, "[b]ecause probable cause requires only a probability or substantial chance of criminal activity, rather than an actual showing of criminal activity, the police need not have amassed enough evidence to justify a conviction prior to making a warrantless arrest." *United States v. Mendoza,* 421 F.3d 663, 667 (8th Cir. 2005) (*citation omitted*). *See also United States v. Jones,* 535 F.3d 886, 890 (8th Cir. 2008).

In this case, the officers at the scene had ample reason to believe that Baldenegro-Valdez was involved in criminal activity when Baldenegro-Valdez was arrested. Law enforcement officers had observed – through surveillance – Baldenegro-Valdez' presence and (at least) limited participation in the two controlled buys with the CI. Moreover, with regard to the first transaction, officers had tested and confirmed that an actual controlled substance was sold. At the time of the stop of the Taurus, Baldenegro-Valdez was following the CI's vehicle as it was traveling to seemingly complete a second drug buy. Under these circumstances, law enforcement officers had sufficient probable cause to arrest Baldenegro-Valdez because of the previously observed and confirmed drug buy, as well as the details of the ongoing second transaction which was happening at the time of the stop.

Baldenegro-Valdez argues, however, that Officer Warren did not arrest him for possession or distribution of a controlled substance, but instead only told him that he was being arrested for operating a vehicle without a valid United States driver's license after Baldenegro-Valdez presented what he alleged to be a valid Mexican driver's license. As correctly noted by Baldenegro-Valdez, the State of Missouri does permit the operation of motor vehicles by several classes of people, specifically including:

> A nonresident who is at least sixteen years of age and who has in his immediate possession a valid license issued to him in his home state or country.

MO. REV. STAT. § 302.080.1(2). Indeed, there seems little doubt that Officer Warren made a mistake of law in arresting Baldenegro-Valdez for operating a vehicle with only a valid Mexican driver's license. Some courts have concluded that such a mistake of law precludes an argument that an officer's actions were objectively reasonable. *See*, *e.g.*, *United States v. DeGasso*, 369 F.3d 1139, 1144 (10th Cir. 2004) (an officer's "failure to understand the plain and unambiguous law he is charged with enforcing . . . is not objectively reasonable"). The law in the Eighth Circuit is not so clear. *See*, *e.g.*, *United States v. Smart*, 393 F.3d 767, 770 (8th Cir. 2005) ("[I]n our circuit the distinction between a mistake of law and a mistake of fact is irrelevant to the fourth amendment inquiry . . . , the validity of a stop depends on whether the officer's actions were objectively reasonable in the circumstances, and in mistake cases the question is simply whether the mistake, whether of law or of fact, was an objectively reasonable one.").

The Court concludes, however, that an analysis of the objective reasonableness of Officer Warren's belief that Baldenegro-Valdez was required to have a valid driver's license issued by one of the fifty states is unnecessary. In *Virginia v. Moore*, 553 U.S. 164, 128 S.Ct. 1598 (2008), the Supreme Court concluded that, for purposes of a motion to suppress for an allegedly

9

unconstitutional arrest, the sole question to be examined is whether probable cause exists for the arrest – regardless of the application or propriety of the underlying state law cited as the basis for the arrest. *Id*. at 173-74, 128 S.Ct. at 1605-06. *See also Thomas v. City of Peoria*, 580 F.3d 633, 637 (7th Cir. 2009) (in light of *Moore*, "if an arrest is otherwise reasonable, the fact that it is not for an 'arrestable' offense does not make it unconstitutional").

In this case, the warrantless arrest of Baldenegro-Valdez was constitutional based on probable cause that he had possessed and distributed a controlled substance, as well as the fact that he was operating a vehicle with a cracked windshield. The fact that <u>state</u> law did not permit the arrest of Baldenegro-Valdez for driving a vehicle with a valid Mexican driver's license (the sole reason articulated by Officer Warren at the scene of Baldenegro-Valdez' arrest) does not negate the fact that law enforcement officers had otherwise valid probable cause to arrest Baldenegro-Valdez.

With regard to the ensuing search of the Taurus, constitutional concerns again are raised because no search warrant was obtained prior to the search. Indeed, it axiomatic that "[s]earches conducted without a warrant are *per se* unreasonable, subject to a few well-established exceptions." *United States v. Madrid*, 152 F.3d 1034, 1037 (8th Cir.1998). The government, in this case, seeks to justify the search under three different recognized exceptions to the warrant requirement, to wit: the "automobile exception," search incident to arrest, and an inventory search.

The so-called "automobile exception" authorizes law enforcement officers "to search a vehicle without a warrant if they have probable cause to believe the vehicle contains evidence of criminal activity." *United States v. Davis*, 569 F.3d 813, 816 (8th Cir. 2009) (*quoting United States v. Hill*, 386 F.3d 855, 858 (8th Cir. 2004)). The Supreme Court has justified this

departure from the traditional warrant requirement because of the lower expectation of privacy in vehicles and also their unique mobility. *California v. Carney*, 471 U.S. 386, 390-91, 105 S.Ct. 2066, 2069 (1985). Probable cause to search an automobile "exists when there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Palega*, 556 F.3d 709, 714 (8th Cir. 2009). Moreover, officers conducting an automobile exception search are authorized to search any area of a vehicle in which the evidence might be found. *United States v. Wells*, 347 F.3d 280, 287 (8th Cir. 2003).

Applying these principles to the present case, the Court has no difficulty in concluding that the search of the Taurus on March 21, 2010, was a valid warrantless search under the automobile exception. Law enforcement officers had probable cause to believe that the Taurus contained evidence of criminal activity – either the marked bills from the first drug buy earlier in the day or methamphetamine. Moreover, it was reasonable for the officers performing the search of the Taurus to search for hidden compartments where drugs and/or other contraband are often hidden by individuals engaged in criminal activities.

Having concluded that the warrantless search of the Taurus was justified by the automobile exception, the Court need not necessarily address the government's remaining two justifications. However, for the sake of completeness (and as possible alternative holdings), the Court will briefly discuss the two other cited exceptions to the warrant requirement.

Prior to 2009, the Eighth Circuit generally concluded that if officers had probable cause to arrest a driver, the officers had the right to not only search the driver's person incident to the arrest, but also to search the passenger compartment of his vehicle. *United States v. Poggemiller*, 375 F.3d 686, 687 (8th Cir. 2004) ("Under [*New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860 (1981)], when a police officer makes a lawful custodial arrest of an automobile's occupant, the

11

Fourth Amendment allows the officer to search the vehicle passenger compartment as a contemporaneous incident of arrest."). In 2009, however, the Supreme Court issued its opinion in *Arizona v. Gant*, — U.S. —, 129 S.Ct. 1710 (2009), and held that officers "may search a vehicle incident to a recent occupant's arrest <u>only</u> if the arrestee is within reaching distance of the passenger compartment at the time of the search, or it is reasonable to believe the vehicle contains evidence of the offense of arrest." — U.S. at —, 129 S.Ct. at 1723 (*emphasis added*).

*Gant* thus permits a warrantless search incident to arrest of a vehicle in only two circumstances. First, arresting officers are permitted to search the passenger compartment of a vehicle when an arrestee "is within reaching distance of the passenger compartment at the time of the search." This aspect of *Gant* has no application in this case inasmuch as the search of the Taurus occurred while Baldenegro-Valdez was handcuffed in the back of Officer Warren's squad car. *Compare United States v. Webster*, — F.3d —, 2010 WL 4366379, op. at *5 (8th Cir. Nov. 5, 2010) (first prong of *Gant* was inapplicable where the defendant "had already been arrested, handcuffed, and moved away from the truck at the time of the search").

The second application of *Gant* permits an officer to conduct a vehicle search incident to an arrest where "it is reasonable to believe the vehicle contains evidence of the offense of arrest." In this case, Baldenegro-Valdez argues that he was only arrested for operating a vehicle without a valid United States driver's license and there was no reason for officers to believe that a search of the Taurus would uncover evidence related to <u>that offense</u>. The government argues that the same expansive view of probable cause to support an arrest as was found by the Supreme Court in *Moore* should be applied to the second *Gant* application. The government's argument, however, is problematic in two regards. First, the Court in *Gant* specifically used the phrase "the offense of arrest" which seems more limiting than the broad, abstract "probable cause"

12

language in *Moore*. In addition, if accepted, the government's broad reading of the phrase "the offense of arrest" would effectively undermine the holding in *Gant* with the exception swallowing the rule.

In *Webster*, the Eighth Circuit was recently confronted with a similar fact situation. In *Webster*, law enforcement officers stopped a defendant's vehicle following an attempt at a third controlled purchase of crack cocaine (two prior controlled purchases had been consummated with the defendant). The officer effectuating the arrest of the defendant allegedly[4] did so for "parking the wrong way on the street." *Id*. at *1. The officers then searched the defendant's vehicle and found various items of contraband including 62.5 grams of crack cocaine. *Id*. at *2. On appeal, the defendant argued that the warrantless vehicle search could not be justified as a search incident to arrest because the defendant was only arrested for a parking violation and the search of the vehicle was unrelated to that offense. The Eighth Circuit chose not to resolve the issue, noting:

> [W]e find it unnecessary to resolve the factual dispute regarding the basis for arrest in light of the alternative grounds discussed by the court. In addition to the search incident to arrest exception, the court invoked the automobile exception . . . . Warrantless searches need only be justified by one exception to the Fourth Amendment warrant requirement [and] the warrantless search was justified under the automobile exception, irrespective of the applicability of the search incident to arrest exception.

*Id*. at *6. *See also United States v. Grooms*, 602 F.3d 939, 942 (8th Cir. 2010) ("[B]ecause we conclude the search of [the defendant's] vehicle was supported by probable cause, it is no longer necessary to justify the warrantless nature of the search as one incident to arrest; rather the

---

[4] There was some confusion in the appellate record as to whether the parking charge was the sole reason given for the defendant's arrest.

warrantless search can be justified under the automobile exception."). Following the Eighth Circuit's lead, then, this Court does not reach a decision on the post-*Gant* application of a search incident to arrest to the particular facts of this case.

With regard to the government's final argument, the Court notes that another recognized exception to the requirement of a warrant is the so-called inventory search. In general, when taking custody of property such as a suspect's vehicle, law enforcement officers may conduct a warrantless search and inventory of the contents of the vehicle in order to protect the owner's property, to protect the police against claims of lost or stolen property, and to protect the police from potential danger. *Colorado v. Bertine*, 479 U.S. 367, 372, 107 S.Ct. 738, 741 (1987). The government argues that the search of the Taurus herein was a valid inventory search. The Court agrees.

The central inquiry in determining whether such an inventory search is reasonable is a consideration of the totality of the circumstances. *United States v. Marshall*, 986 F.2d 1171, 1174 (8th Cir. 1993). To that end, "inventory searches conducted according to standardized police procedures, which vitiate concerns of an investigatory motive or excessive discretion, are reasonable." *Id.* Consequently, to be constitutional, "[a] warrantless inventory search must be done pursuant to standard police procedures and for the purpose of protecting the car and its contents." *United States v. Best*, 135 F.3d 1223, 1225 (8th Cir. 1998). In this case, the Court concludes that the inventory search of the Taurus was done pursuant to police department policy.

Baldenegro-Valdez' final argument seeks the suppression of any statements made by Baldenegro-Valdez to law enforcement officers after his arrest and the search of the Taurus. In advancing this argument, Baldenegro-Valdez offers no argument or evidence suggesting that he was not advised of his *Miranda* rights, that he understood those rights, and that he knowingly

and voluntarily waived those rights. Nonetheless, Baldenegro-Valdez asserts that other factors identified by the Supreme Court in *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254 (1975) support suppression (*i.e.*, temporal proximity between arrest and confession, intervening circumstances, and flagrancy of police misconduct). The Court finds no evidentiary support for Baldenegro-Valdez' assertion and concludes that the totality of the circumstances do not show that Baldenegro-Valdez' will was overborne – instead the evidence all points toward a voluntary statement that is not subject to exclusion.[5]

Accordingly, it is

**RECOMMENDED** that the Court, after making an independent review of the record and applicable law, enter an order **DENYING** Baldenegro-Valdez' MOTION TO SUPPRESS EVIDENCE AND STATEMENTS (Doc. 29) filed on July 18, 2010.

Counsel are reminded that each has 14 days from the date of receipt of a copy of this report and recommendation to file and serve specific objections to the same. A failure to file and serve timely objections shall bar attack on appeal of the factual findings in this report which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

　　　　　　　　　　　　　　　　　　　　　*/s/ John T. Maughmer*
　　　　　　　　　　　　　　　　　　　　**John T. Maughmer**
　　　　　　　　　　　　　　　　　　　**United States Magistrate Judge**

---

[5] In addition, in light of the Court's conclusion that neither the arrest of Baldenegro-Valdez nor the search of the Taurus were unconstitutional, the Court need not consider whether the subsequent statements by Baldenegro-Valdez to law enforcement officers were fruit of the poisonous tree. *Compare Wong Son v. United States*, 371 U.S. 471, 484, 83 S.Ct. 407, 415-16 (1963).